**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

**JAMES D. GRECO,**

        Plaintiff,

v.

**WILLIAM STONE, Individually and in his Official Capacity as a Police Officer for the City of Moultrie; BRIAN NEWVINE, Individually and in his Official Capacity as a Police Officer for the City of Moultrie; CITY OF MOULTRIE; and MOULTRIE POLICE DEPARTMENT,**

        Defendants.

Civil Action 7:09-CV-156 (HL)

**ORDER**

This case is before the Court on Defendants' Motion for Summary Judgment (Doc. 36). For the reasons discussed below, the Motion is granted.

**I.  FACTS**

This case arises out of an incident that took place on December 27, 2007. Plaintiff James Greco lived in Moultrie, Georgia with his wife, Cynthia Greco, and stepdaughter, Tayler Threadgill. Plaintiff's other stepdaughter, Courtney Threadgill, also lived in Moultrie, but no longer lived at the Greco home. (Deposition of James Greco, pp. 95-96). At that time, Tayler was 15 years old, and Courtney was 17 years old. (DSOMF ¶¶ 3-4).[1]

---

[1]The facts in this case are largely undisputed. "DSOMF" refers to Defendants' Statement of Undisputed Material Facts (Doc. 39). The cited paragraphs are those admitted by

On the afternoon of December 27, Plaintiff and Cynthia got into an argument. (DSOMF ¶ 5). Cynthia told Tayler to pack a bag because the two of them were going to spend the night at a hotel, but they did not leave the house at that time. (DSOMF ¶¶ 6-7). Later that day, Plaintiff and Tayler got into an argument. (DSOMF ¶ 8). They yelled at each other and used profanity towards each other. (DSOMF ¶¶ 9-10). Following this argument, Tayler called Courtney, who was working at the Zaxby's in Moultrie. (DSOMF ¶ 11). Courtney drove to the Greco home, picked up Tayler, and took Tayler with her to Zaxby's. (DSOMF ¶ 12).

At approximately 7:00 p.m., Plaintiff took his mother to Wal-Mart. (DSOMF ¶ 13). While waiting in his vehicle for his mother to finish shopping, Plaintiff talked to Cynthia on the telephone. (DSOMF ¶ 15). During that conversation, they decided that Tayler needed to spend the night at home. (DSOMF ¶ 16). Plaintiff and Cynthia agreed that they would meet at Zaxby's and take Tayler home. (DSOMF ¶ 17).

Plaintiff then drove from Wal-Mart to Zaxby's, parked in the parking lot, and got out of his car. (DSOMF ¶ 18). Plaintiff spoke to Tayler's boyfriend, Ross Thomas, who was in the parking lot. (DSOMF ¶¶ 19-20). Thomas walked into the restaurant, and returned approximately ten minutes later with Courtney and Tayler. (DSOMF ¶ 21). By the time the girls came out of the restaurant, Cynthia had arrived. (DSOMF ¶ 22).

_____

Plaintiff in his response to the statement of facts.

Cynthia told Tayler that she had to come home, but Tayler refused to do so. (DSOMF ¶ 23). Courtney told Tayler that Tayler did not have to listen to Plaintiff or Cynthia, and that Tayler could stay with Courtney at Zaxby's. (DSOMF ¶ 24). Plaintiff, Cynthia, Courtney, and Tayler all began to argue with each other. Courtney used profanity toward Plaintiff (DSOMF ¶ 26), and Tayler repeatedly asked Plaintiff why he was "being such an ass." (DSOMF ¶ 27). Plaintiff yelled at both Tayler and Courtney, and used profanity towards both of them. (DSOMF ¶¶ 28, 30). Plaintiff repeatedly told Tayler "to get her ass in the fucking car." (DSOMF ¶ 31). He told Courtney that she did not "need to get [her] ass where it doesn't belong. Get back into work and take care of yourself." (DSOMF ¶ 32). Plaintiff also told Courtney that he would "bust her ass" and would "put her ass on the ground." (DSOMF ¶ 33). According to Courtney, Plaintiff told her that he would "bash her head through a wall." (Deposition of Courtney Threadgill, p. 27). Plaintiff does not recall saying that to Courtney. (J. Greco Dep., p. 56). During the course of the argument, Cynthia said to Plaintiff, "Please don't hit the girls." (DSOMF ¶ 35).

Near the end of the argument, Plaintiff told Tayler that "I'm going to count to ten, and if you don't get in the car with your mama, I'll help you get in that car." (DSOMF ¶ 36). Plaintiff counted to five, and Tayler started walking away. (DSOMF ¶ 38). Plaintiff then told Tayler that he was going to call the police and file a juvenile report on her. (DSOMF ¶ 39). While Plaintiff called 911, Tayler, Courtney, and Thomas walked back inside the restaurant. (DSOMF ¶ 41).

3

Defendant William Stone, who was employed by the City of Moultrie as a police officer, was dispatched to Zaxby's. (DSOMF ¶¶ 42, 82). Plaintiff told Stone that he was having problems with his 15-year-old daughter and that he wanted Tayler to be placed in the car with her mother. (DSOMF ¶ 43). At some point, Kimberly Weissinger, another police officer, arrived at the scene. (DSOMF ¶ 44).

After Weissinger arrived, Tayler, Courtney, Thomas, and a black female walked out of the restaurant. (DSOMF ¶ 45). Weissinger spoke with all four of them. (DSOMF ¶ 46). Tayler told Weissinger that Plaintiff had been yelling at her and threatening her. (DSOMF ¶ 47). Tayler also told Weissinger that she was scared for her safety. (DSOMF ¶ 48). Courtney told Weissinger that Plaintiff had been yelling and using profanity. (DSOMF ¶ 49). Courtney also told Weissinger that Plaintiff had threatened to slam her head into the wall. (DSOMF ¶ 50). According to Tayler, Stone was present when she and Courtney were describing what had transpired to Weissinger. (Deposition of Tayler Threadgill, p. 45).

Also present at Zaxby's was Amichico Farrell, the restaurant manager and Courtney's boss. (DSOMF ¶ 52). Farrell told Weissinger or Stone, or both, that Plaintiff had used loud and profane language towards Courtney and stated that he would slam or crush Courtney's head into the wall. (DSOMF ¶ 54). Farrell also told the officers that Plaintiff had caused a disturbance at the restaurant and had been asked to leave. (Affidavit of Amichico Farrell, ¶ 15). Plaintiff denies that he ever entered the restaurant. (J. Greco Dep., p. 89).

After listening to what Courtney, Tayler, and the others had to say, Stone walked back over to Plaintiff and spoke with him again. (DSOMF ¶ 56). Stone told Plaintiff that Courtney and Tayler felt like they were in danger, and asked if Plaintiff would allow Tayler to spend the night away from home. (DSOMF ¶ 57). Plaintiff told Stone that he did not want to reward Tayler for her bad behavior. (DSOMF ¶ 58).

Stone then walked back over to Courtney, Tayler, and Weissinger. (DSOMF ¶ 59). At some point after Stone's second conversation with Plaintiff, Defendant Brian Newvine arrived at the scene. (DSOMF ¶ 60). Newvine was also employed by the City of Moultrie as a police officer (DSOMF ¶ 82), and was Stone's immediate supervisor. (DSOMF ¶ 61). Newvine spoke with Stone and Weissinger. (DSOMF ¶ 62). Stone explained the situation to Newvine, and the two officers discussed the elements of the crimes of disorderly conduct and simple assault. (DSOMF ¶ 63). Plaintiff was subsequently placed under arrest for both disorderly conduct and simple assault. (DSOMF ¶ 64). Plaintiff was handcuffed, placed in Weissinger's vehicle, and transported to the Colquitt County Jail. (DSOMF ¶ 65).

Following Plaintiff's arrest, Cynthia called Martha Gray, the Colquitt County Magistrate Judge. (DSOMF ¶ 68). Cynthia told Judge Gray about what had happened, and asked to meet with her. (DSOMF ¶ 69). Judge Gray agreed to meet with Cynthia the next morning. (DSOMF ¶ 70).

On December 28, 2007, Cynthia and Chuck May, a Norman Park police officer, met with Judge Gray in the judge's chambers. (DSOMF ¶ 71). Cynthia

explained what had taken place the night before, and Judge Gray told Cynthia that she would not sign a warrant, but instead would hold a pre-warrant hearing. (DSOMF ¶ 73). While Judge Gray was meeting with Cynthia, Stone arrived to have a warrant signed. (DSOMF ¶ 74). Judge Gray instructed Stone to go to the jail and release Plaintiff. (DSOMF ¶ 75).

On December 29, 2007, Judge Gray signed arrest warrants against Plaintiff for both disorderly conduct and simple assault. (DSOMF ¶ 77). On January 4, 2008, Judge Gray held a pre-warrant hearing with respect to Plaintiff's arrest. (DSOMF ¶ 78). Although it is not entirely clear what happened following the hearing, it appears that the prosecution of Plaintiff was dropped. (DSOMF ¶ 81).[2]

Stone has been employed by the City of Moultrie (the "City") as a police officer since 2001. (Deposition of William Stone, pp. 14-15). He received his P.O.S.T. certification in March of 2002. (Stone Dep., p. 15). His P.O.S.T. certification has never been suspended. (Stone Dep., p. 15).

Stone has received a number of reprimands during his time with the City of Moultrie. In 2003, he was reprimanded for not writing down addresses, for failing to follow regulations regarding his uniform, and for use of profane language while on duty. (Affidavit of Theodosia Lovett, Ex. A). In 2004, Stone was written up for insubordination after arguing with a colleague. (Lovett Aff., Ex. B). In 2005, he

---

[2]The sequence of events involving Judge Gray is somewhat confusing, as it is not clear why she signed the warrants and then had a pre-warrant hearing. These matters do not change the ultimate outcome of the case, but are curious.

received a letter of concern regarding his failure to follow instructions on the proper completion of reports (Lovett Aff., Ex. D), a written warning regarding a traffic stop in which he arrested a suspect for DUI before obtaining probable cause (Lovett Aff., Ex. E), and was reprimanded for the improper use of a taser. (Lovett Aff., Ex. F). In 2006, Stone was again reprimanded for the improper use of a taser. (Lovett Aff., Ex. G), was written up regarding two separate traffic accidents (Lovett Aff., Ex. H-I), received a written warning after calling some citizens "lying sons of bitches" during a call (Lovett Aff., Ex. M), and was written up for getting into a heated discussion with a victim and witness during a call. (Lovett Aff., Ex. N-O). In 2009, Stone was reprimanded for making an arrest without proper cause. (Lovett Aff., Ex. P). In 2004 and 2009, Stone was required to undergo fitness for duty psychological examinations. (Lovett Aff., Ex. Q-R). After each, he was allowed to return to the police force. (Lovett Aff., Ex. Q-R).

On December 28, 2009, Plaintiff filed a complaint alleging that Stone, Newvine, the City, and the Moultrie Police Department ("MPD") violated his Eighth and Fourteenth Amendment rights. On September 3, 2010, Plaintiff filed an amended complaint against the same defendants, alleging that his Fourth, Eighth, and Fourteenth Amendment rights had been violated; that the City and the MPD are liable for the negligent hiring and negligent retention of Stone and Newvine; that the City and the MPD established customs, practices, and procedures that precipitated the actions of Stone and Newvine in violating his constitutional rights; and that the

City and the MPD negligently supervised their officers. Defendants have moved for summary judgment on all of the claims.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue to any material facts and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).

When considering a motion for summary judgment, the Court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. Id. at 254-55. The Court may not, however, make credibility determinations or weigh the evidence. Id. at 255.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986) (internal quotation marks omitted). If the moving party meets this burden, the burden shifts to the nonmoving party to go beyond the pleadings and

present specific evidence showing that there is a genuine issue of material fact, or that the moving party is not entitled to judgment as a matter of law. Id. at 324-26. If the evidence that the nonmovant presents, however, is "not significantly probative" or is "merely colorable," then summary judgment may be granted. Anderson, 477 U.S. at 249. This evidence must consist of more than mere conclusory allegations. See Avrigan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## III.    ANALYSIS

### A.    Moultrie Police Department

Plaintiff has named the MPD as a defendant in this action. Defendants contend that the MPD should be dismissed from the case because it is not a legal entity capable of being sued. The Court agrees. The MPD is not a proper party to this action. See Dean v. Barber, 951 F.2d 1210, 1214 (11th Cir. 1992) ("Sheriff's departments and police departments are not usually considered legal entities subject to suit."); Bunyon v. Burke County, 285 F.Supp.2d 1310, 1328 (S.D. Ga. 2003) (dismissing claim against police department after finding it was not a legal entity subject to suit). Defendants' Motion for Summary Judgment on this point is granted, and the MPD is dismissed from this case.

**B.    Eighth and Fourteenth Amendment Claims; Negligent Hiring Claim; Negligent Supervision Claim; Section 1983 Custom, Practice, and Procedure Claim**

In his amended complaint, Plaintiff alleges that Defendants violated his Eighth and Fourteenth Amendment rights, and that the City negligently hired Stone and Newvine. Defendants moved for summary judgment on these claims, but Plaintiff failed to respond to the motion as to the claims. As Plaintiff did not address these claims in his response, they are deemed abandoned. Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 971 n. 36 (11th Cir. 2008) ("[Plaintiff] did not defend the claim on summary judgment; he thus abandoned it.); Road Sprinkler Fitters v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994) (claims not addressed in response to summary judgment motion deemed abandoned).

Defendants also moved for summary judgment on Plaintiff's negligent supervision claim against the City. Plaintiff contends that the City was recklessly indifferent in supervising its officers, but provides no argument to support the claim. Instead, he just makes a conclusory statement that he has presented facts to create a jury question on the issue. "The onus is upon the parties to formulate arguments," Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995), and Plaintiff has not done so here. The Court concludes that Plaintiff has abandoned his negligent supervision claim, and grants summary judgment in Defendants' favor on that claim.

Plaintiff also alleges in his amended complaint that the City established customs, practices, and procedures that precipitated the actions of Stone and Newvine in violating his constitutional rights. Defendants moved for summary judgment on this claim as well. A municipality is liable under § 1983 when its official policy, procedure, or custom causes a constitutional violation and causes injury to the plaintiff. *See* Grech v. Clayton County, Ga., 335 F.3d 1326, 1329 (11th Cir. 2003) (*en banc*). Nowhere in his response to Defendants' motion does Plaintiff identify any customs, practices, or procedures implemented by the City which caused a constitutional violation and injury. Without some evidence to support his claim of a policy or custom or practice, the claims against the City cannot stand. The City is entitled to summary judgment on the § 1983 claims against it.

### C.    Fourth Amendment Claim

#### 1.    Individual capacity

Plaintiff contends that Stone and Newvine violated the Fourth Amendment by arresting him without probable cause or an arrest warrant. Stone and Newvine assert that they are entitled to qualified immunity on the Fourth Amendment claims brought against them in their individual capacities.

"The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." Cottone v. Jenne, 326 F.3d 1352, 1357

11

(11th Cir. 2003) (internal quotation marks and quotation omitted). Qualified immunity is intended to "allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

To be eligible for qualified immunity, the government official "must first establish that he was performing a 'discretionary function' at the time the alleged violation of federal law occurred." Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004) (citing Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1263 (11th Cir. 2004)). Once the official shows he was engaged in a discretionary function, "the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity." Id.

Plaintiff does not dispute that Stone and Newvine were engaged in a discretionary function at the time of the arrest. In any event, the Court finds that they were in fact engaged in a discretionary function, as making an arrest is a discretionary function, and is certainly an act of "a type that [falls] within the employee's job responsibilities." Id. (quoting Holloman, 370 F.3d at 1265). Thus, the burden now shifts to Plaintiff to show that qualified immunity should not apply.

"In analyzing the applicability of qualified immunity, the Court has at its disposal a two-step process. Traditionally, a court first determines whether the

officer's conduct amounted to a constitutional violation. Second, the Court analyzes whether the right violated was clearly established at the time of the violation." <u>Lewis v. City of West Palm Beach, Fla.</u>, 561 F.3d 1288, 1291 (11th Cir. 2009) (citations omitted). While <u>Lewis</u> sets out the traditional order in which courts examine the two prongs of the qualified immunity test, in <u>Pearson v. Callahan</u>, 555 U.S. 223, 129 S.Ct. 808, 821 (2009), the Supreme Court held that the qualified immunity test may be considered in whatever order is most appropriate for the case.

Before getting further into the qualified immunity analysis, the Court must address an issue raised by Plaintiff in his response to Defendants' motion. Plaintiff asserts that his arrest was unlawful because it violated Georgia law. He relies on O.C.G.A. § 17-4-20(a), which provides:

> An arrest for a crime may be made by a law enforcement officer either under a warrant or without a warrant if the offense is committed in such officer's presence or within such officer's immediate knowledge; if the offender is endeavoring to escape; if the officer has probable cause to believe that an act of family violence, as defined in Code Section 19-13-1, has been committed; if the officer has probable cause to believe that an offense involving physical abuse has been committed against a vulnerable adult, who shall be for the purposes of this subsection a person 18 years old or older who is unable to protect himself or herself from physical or mental abuse because of a physical or mental impairment; or for other cause if there is likely to be failure of justice for want of a judicial officer to issue a warrant.

O.C.G.A. § 17-4-20(a).

Plaintiff states that because the alleged crimes were not committed in their presence, Stone and Newvine could have arrested him only if one of the exceptions presented in § 17-4-20(a) applied. Plaintiff contends that the only exception that could have possibly applied was the family violence exception, but it cannot be used because the term "family violence" does not include reasonable discipline administered by a parent to a child, and that is what occurred here. *See* O.C.G.A. § 19-13-1. Plaintiff also argues that because disorderly conduct is not mentioned in the family violence statute, there is no legal authority for an officer to arrest someone for disorderly conduct if the crime was not committed in the officer's presence or within his immediate knowledge. However, the case of <u>Durden v. State</u>, 250 Ga. 325, 297 S.E.2d 237 (1983), forecloses Plaintiff's arguments.

The defendant in <u>Durden</u> argued that his warrantless arrest was unlawful under federal and state law. The Supreme Court of Georgia noted that there were two focal points in determining whether a warrantless arrest is valid. The first was the federal probable cause test. The second was state statutory law, in particular what is now O.C.G.A. § 17-4-20 (formerly Code Ann. § 27-207), which listed the situations in which a warrantless arrest is permissible. The justices held:

> We find that these dual inquiries, one under federal law and one under state law, serve no useful purpose and result in complicating the law in an area which needs to be readily understood by law enforcement officers. Hence we hold that if an officer, while in the presence or vicinity of the accused, acquires "probable cause" (federal) to arrest the accused outside his or her home, and fails to make

such arrest, there is likely to be a failure of justice as a matter of law if the officer is required to delay the arrest until a warrant is obtained. That is to say, we find the state rule to be the same as the federal rule. An arrest and search, legal under federal law, are legal under state law.

Id. at 327.

In other words, "[a]n arrest meeting the constitutional requirements of probable cause is valid whether or not O.C.G.A. § 17-4-20 was violated." Bodiford v. State, 169 Ga. App. 760, 760-61, 315 S.E.2d 274, 275 (1984) (citation and punctuation omitted). Thus, the Court's inquiry is whether there was probable cause to arrest Plaintiff. Whether O.C.G.A. § 17-4-20 was violated is irrelevant for purposes of this case.

"Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." Case v. Eslinger, 555 F.3d 1317, 1327 (11th Cir. 2009) (citation omitted). For purposes of deciding whether an official is entitled to qualified immunity, the question is whether there was arguable probable cause to arrest. Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." Case, 555 F.3d at 1327 (internal quotation marks and quotation omitted). In determining whether arguable probable

cause existed at the time of the arrest, the court applies an objective standard, and the officer's intent or motivation is irrelevant. Lee, 284 F.3d at 1195.

Whether an arresting officer possesses arguable probable cause depends on the elements of the alleged crime. Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007) (citation omitted). Plaintiff was arrested for disorderly conduct and simple assault. If Stone and Newvine possessed arguable probable cause to arrest Plaintiff for either crime, they are entitled to qualified immunity. Id.

Under Georgia law, a person commits the offense of disorderly conduct when the person does any of the following:

(1)     Acts in a violent or tumultuous manner toward another person whereby such person is placed in reasonable fear of the safety of such person's life, limb, or health;

(2)     Acts in a violent or tumultuous manner toward another person whereby the property of such person is placed in danger of being damaged or destroyed;

(3)     Without provocation, uses to or of another person in such other person's presence, opprobrious or abusive words which by their very utterance tend to incite to an immediate breach of the peace, that is to say, words which as a matter of common knowledge and under ordinary circumstances will, when used to or of another person in such other person's presence, naturally tend to provoke violent resentment, that is, words commonly called "fighting words"; or

(4)     Without provocation, uses obscene and vulgar or profane language in the presence of or by

16

telephone to a person under the age of 14 years which threatens an immediate breach of the peace.

O.C.G.A. § 16-11-39(a).

If Stone and Newvine had arguable probable cause to arrest Plaintiff under any of the disorderly conduct statutory subsections, they are entitled to qualified immunity. *See* <u>Grider v. City of Auburn, Ala.</u>, 61 F.3d 1240, 1257 (11th Cir. 2010) ("If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply.) The question before the Court is whether a reasonable oficer in the same circumstances and possessing the same knowledge as Stone and Newvine could have believed probable cause existed to arrest Plaintiff for disorderly conduct.

It is important to remember that the "validity of the arrest does not turn on the offense announced by the officer at the time of the arrest." <u>Lee</u>, 284 F.3d at 1195-96. Plaintiff focuses on Stone's testimony that Plaintiff was arrested for his actions toward Courtney, and argues that the elements for a disorderly conduct arrest with regard to Courtney were not met. Plaintiff's position, however, misses the point in a qualified immunity analysis. The Court has to look at the bigger picture - based on everything the officers were aware of at the time, did they have arguable probable cause to arrest Plaintiff for <u>any</u> crime? "Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and

transform arresting officers into prosecutors." Id. at 1195 (quotation omitted). "[W]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." Id. at 1196 (quotation omitted).

It is undisputed that Plaintiff yelled at Tayler and Courtney, and used profanity towards both of them. Tayler told Weissinger that Plaintiff had been yelling and threatening her, and told the officers that she was in fear for her safety. Courtney told Weissinger that Plaintiff had been yelling, using profanity, and threatened to bash her head into the wall. Courtney's boss told Stone or Weissinger, or both, that Plaintiff had used loud and profane language towards Courtney and stated that he would slam or crush Courtney's head into the wall. She also told the officers that Plaintiff had caused a disturbance at the restaurant and had been asked to leave. It is further undisputed that Stone told James that Courtney and Tayler felt like they were in danger, which means at some point Stone had to have been given that information.

Based on the information related to Stone from Weissinger, and to whatever extent from Tayler and Courtney directly, Stone and Newvine had arguable probable cause to arrest Plaintiff for acting in a "violent or tumultuous manner toward another person whereby such person is placed in reasonable fear of the safety of such person's life, limb, or health." O.C.G.A. § 16-11-39(a)(1). The fact that Stone and

18

Newvine did not witness the conduct does not change the outcome, as the totality of the information supplied to the officers provided arguable probable cause. The Court finds that Plaintiff cannot establish a Fourth Amendment violation. Stone and Newvine are entitled to qualified immunity on the false arrest claim.[3]

### 2. Official capacity

Plaintiff has also sued Stone and Newvine in their official capacities, but those claims must be dismissed. A § 1983 lawsuit against a government official in his official capacity is considered to be a suit against the entity that he represents. Mann v. Taser Intern., Inc., 588 F.3d 1291, 1309 (11th Cir. 2009) (citation omitted). Thus, Plaintiff's suit against Stone and Newvine in their official capacities is the equivalent of suing the City, which is a named defendant in this case. The official capacity claims are redundant, and are dismissed.

### D. Negligent Retention Claim

Plaintiff's final claim is against the City. He contends the City negligently retained Stone and Newvine. However, a state law negligent retention claim is an "essentially derivative" claim that survives summary judgment only if the substantive claims on which it was based also survive. See MARTA v. Mosley, 280 Ga. App. 486, 634 S.E.2d 466 (2006); Phinazee v. Interstate Nationalease, Inc., 237 Ga. App. 39, 514 S.E.2d 843, 846 (1999). As the Court has found no liability on the underlying

---

[3]As Stone and Newvine had arguable probable cause to arrest Plaintiff for disorderly conduct, it is not necessary for the Court to determine if probable cause existed to arrest Plaintiff for simple assault.

constitutional claims, the negligent retention claim cannot stand. The City is entitled to summary judgment on the negligent retention claim.

**IV.    CONCLUSION**

Defendants' Motion for Summary Judgment (Doc. 36) is granted. The Clerk of Court is directed to close this case.

**SO ORDERED**, this the 24th day of June, 2011.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

mbh